FILED
2023 Jul-28  PM 04:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **ANDERSON WELLS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 2:21-cv-1456-AMM** |
| | ) | |
| **CITY OF BIRMINGHAM** | ) | |
| **POLICE DEPARTMENT and** | ) | |
| **SERGEANT WILLIAM** | ) | |
| **BLACKWELL,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

This case comes before the court on a motion for summary judgment filed by Defendants Sergeant William Blackwell ("Sergeant Blackwell") and the City of Birmingham ("the City") (collectively, "the Defendants"). *See* Doc. 19. For the reasons explained below, the motion is **GRANTED**.

### I.      BACKGROUND

Material facts set forth in the parties' statement of material undisputed facts are deemed admitted for summary judgment purposes unless controverted by the response or reply of the opposing party. Doc. 7 at 19–20. The court's initial order further provides that "[a]ll statements of fact, in all sections of the brief, must be supported by specific reference to the CM/ECF document and page number of the evidentiary submission." *Id.* at 18. The court warned the parties: "Compliance with

this requirement will necessitate filing the evidentiary submission in support of the brief separately from the brief and may necessitate filing the evidentiary submission one or more days prior to filing the brief." *Id.* (cleaned up).

The parties did not file compliant briefs. Specifically, the parties did not cite to the CM/ECF document and page number for their evidentiary submission. Accordingly, the court was required to search the parties' evidentiary submissions to attempt to find the referenced evidence. For purposes of summary judgment, these are the material facts:

Plaintiff Anderson Wells "was employed by the City as a Corrections Officer." Doc. 20 ¶ 2; Doc. 26 at 4; *see also* Doc. 1 ¶ 7. In relevant part, Mr. Well's chain of command was as follows: (1) Mr. Wells reported to Lieutenant Simpson; (2) Lieutenant Simpson reported to Captain Wilson; (3) Captain Wilson reported to Sergeant Blackwell; and (4) Sergeant Blackwell reported to Lieutenant Greenberg. Doc. 18-1 at 11; *accord* Doc. 27 at 3; *see also* Doc. 18-4 at 3; *accord* Doc. 26 at 7.

Mr. Wells seeks relief for the alleged violations of his constitutional rights when the Defendants disciplined him for five separate incidents. *See generally* Doc. 1 ¶¶ 14–22, 26–30, 36–39, 44–45, 53–55. Mr. Wells refers to these incidents as the "food cart incident," the "lockdown incident," the "incident with T[o]nya Wright," the "sleeping incident" and the "Echols incident." Doc. 26 at 10, 13, 18–19, 21 (cleaned up). The court uses the names provided by Mr. Wells for each incident.

The food cart incident occurred on February 24, 2019. *See* Doc. 18-1 at 114. During the food cart incident, Mr. Wells "was 'loud and boisterous' and resulted in [Mr. Wells] causing a cart holding meals for the incarcerated to be knocked over." Doc. 20 ¶ 3; Doc. 26 at 4; *see also* Doc. 18-1 at 8, 114. "On October 24, 2019, the City advised [Mr. Wells] in writing that disciplinary action against him was being contemplated for the food cart incident; the pre-determination hearing was held on October 30, 2019." Doc. 20 ¶ 5; Doc. 26 at 4; *see also* Doc. 18-1 at 117. "Deputy Police Chief Scott Praytor made the decision to suspend [Mr. Wells] for three (3) working days" for this incident. Doc. 20 ¶ 6; Doc. 26 at 4; *see also* Doc. 18-1 at 119.

"There are no known instances of any other employee causing a food cart to be knocked over." Doc. 20 ¶ 4; Doc. 26 ¶ 4 at 5 (conceding that there are "no other incidents of other employees kicking an inanimate object"); *see also* Doc. 18-1 at 14; Doc. 18-2 at 32. There has been at least one incident where a female correctional officer kicked a person in the chest. *See* Doc. 26 ¶ 4 at 5; *see also* Doc. 25-24 at 1. The female officer received a three-day suspension for doing so. *See* Doc. 25-24 at 3.

The lockdown incident occurred on June 26, 2019. *See* Doc. 18-1 at 114. The parties do not dispute the following facts regarding the lockdown incident: At the time of the incident, the jail was on "lockdown." Doc. 20 ¶ 8; Doc. 26 at 5 ¶ 8 (disputing only the Defendants' characterization of this event); *see also* Doc. 18-1

at 114.  A "[l]ockdown occurs when there is a search to find and prevent contraband inside the jail." Doc. 20 ¶ 9; Doc. 26 at 4; *see also* Doc. 18-4 at 14–15. During the lockdown, Mr. Wells "stated [that] he needed to leave because he was sick." Doc. 20 ¶ 11; Doc. 26 at 4; *see also* Doc. 18-1 at 10–11. Captain Wilson told Mr. Wells that he could not leave, and after Mr. Wells received this order, he "popped the door" to try and leave the jail. Doc. 18-1 at 10; *see also id*. at 12 (explaining that "pop the door . . . means unlock the door"); *accord* Doc. 20 ¶ 10. Mr. Wells eventually left the jail with permission from Sergeant Blackwell. Doc. 18-1 at 11; *accord* Doc. 20 ¶ 11; Doc. 26 at 4.

The parties dispute whether Captain Wilson should have instructed Mr. Wells not to leave the jail. *Compare* Doc. 20 ¶ 10, *with* Doc. 26 ¶ 10 at 5. Mr. Wells asserts that he "was sick and leaving pursuant to policy" because the lockdown does not alter the sick leave policy. Doc. 26 ¶ 10 at 5; *see also* Doc. 18-1 at 11; Doc. 18-4 at 5. Sergeant Blackwell testified regarding the sick leave policy as follows: "if an employee is present at the jail[ and] realizes he's sick," the employee must "tell his supervisor" and the "supervisor can let [the employee] go" and "has the right to request a doctor's excuse." Doc. 18-4 at 5. Sergeant Blackwell testified that the policy "should be handled the same way" when an employee "becomes sick during a lockdown." *Id*. Sergeant Blackwell further testified that he "told [Captain Wilson] to let [Mr. Wells] go if [Mr. Wells] was sick." *Id*. at 4.

"On July 20, 2020, the City advised [Mr. Wells] in writing that disciplinary action against him was being contemplated for the lockdown incident . . ." Doc. 20 ¶ 13; Doc. 26 at 4; *see also* Doc. 18-1 at 122. The Birmingham Police Department alleged that Mr. Wells "was insubordinate towards Captain . . . Wilson[] when he attempted to leave the . . . [j]ail during a command directed lock-down" and that Mr. Wells "used profanity." Doc. 18-1 at 114. Although Mr. Wells testified that Captain Wilson instructed him not to open the door and that he did try to open the door and leave, Mr. Wells testified that he "totally disagree[s]" with the allegations of insubordination. Doc. 18-1 at 10–12. Mr. Wells further testified that he doesn't "recall using [any] kind of profanity" during this incident. *Id.* at 12.

"[T]he predetermination hearing was held on July 23, 2020." Doc. 20 ¶ 13; Doc. 26 at 4; *see also* Doc. 18-1 at 122. "Police Chief Patrick Smith made the decision to suspend [Mr. Wells] for fifteen (15) working days." Doc. 20 ¶ 14; Doc. 26 at 4; *see also* Doc. 18-1 at 121.

Mr. Wells testified that he "heard" that during the lockdown, "two other [female] officers were written up for using profanity." Doc. 18-1 at 12. It appears that both female officers received a "letter of counseling from unit" for their alleged use of profanity during the lockdown. *See* Doc. 25-22 at 2 (capitalization altered); *see also* Doc. 25-23 at 1 (capitalization altered).

The incident with Tonya Wright occurred on February 25, 2020. *See* Doc. 18-1 at 115. During this incident, Mr. Wells "and Corrections Officer Tonya Wright (female) got into a verbal altercation." Doc. 20 ¶ 21; *see generally* Doc. 26; *see also* Doc. 18-1 at 115. "On September 9, 2020, the City advised [Mr. Wells] in writing that disciplinary action against him was being contemplated for the Wright altercation; the pre-determination hearing was held on September 14, 2020." Doc. 20 ¶ 22; Doc. 26 at 4; *see also* Doc. 18-1 at 127. "Deputy Police Chief Darnell Davenport made the decision to suspend [Mr. Wells] for three (3) working days" for this incident. Doc. 20 ¶ 23; Doc. 26 at 4; *see also* Doc. 18-1 at 129. "Tonya Wright also received three (3) working days suspension for this incident." Doc. 20 ¶ 25; Doc. 26 at 4; *see also* Doc. 18-2 at 26.

"On July 2, 2019, [Mr. Wells] was given a [s]upervisory [r]eferral . . ." Doc. 20 ¶ 16; Doc. 26 ¶ 16 at 5 (disputing only the characterization of the reason for this referral); *see also* Doc. 18-3 at 42–43. The supervisory referral form and accompanying attachment states that Mr. Wells was referred to Behavioral Health Systems ("BHS"), the City's third-party employee assistance program, "for an evaluation of . . . behavioral issues." *Id*. at 43; *see also* Doc. 20 ¶ 19; Doc. 26 at 4; Doc. 18-3 at 15. Mr. Wells disputes the characterization of his "behavioral issues" and contends that these alleged issues were "just disputes." *Compare* Doc. 18-3 at 43, *with* Doc. 26 ¶ 16 at 5. "In or around July 2019, [Mr. Wells] was assessed by

BHS and ultimately completed six one-hour sessions with a counselor." Doc. 20 ¶ 20; Doc. 26 at 4; *see also* Doc. 18-3 at 42.

The sleeping incident occurred on April 1, 2020. *See* Doc. 18-1 at 115. Mr. Wells "fell asleep in the control room while on duty." Doc. 20 ¶ 41; Doc. 26 at 4; *see also* Doc. 18-1 at 17. "As a result, [Mr. Wells] was suspended for three (3) days." Doc. 20 ¶ 42; Doc. 26 at 4; *see also* Doc. 18-1 at 17, 115. Mr. Wells "testified that three other Correctional Officers fall asleep all the time: Camillia Moore (female), Berman Bettis (male), and Chester Robinson (male), but he is not aware of any discipline they have received for falling asleep." Doc. 20 ¶ 44 (cleaned up); Doc. 26 at 4; *see also* Doc. 18-1 at 17.

The Echols incident occurred on May 3, 2020. *See* Doc. 18-1 at 115–16. During this incident, "Corrections Officer Dedrick Echols (male) and [Mr. Wells] got into a verbal altercation." Doc. 20 ¶ 26; Doc. 26 at 4; *see also* Doc. 18-1 at 115–16. Mr. Wells testified regarding the events leading up to the incident as follows: Mr. Wells "and [Officer] Bloodworth w[ere] working" when "Officer Echols and Officer Burton came up to relieve" them. Doc. 18-1 at 18. "Officer Burton . . . came up hasty," and Mr. Wells told Officer Burton to "calm down" because it was "not an emergency" and then began "briefing her on jail procedures." *Id*. Officer Echols "kept interrupting" Mr. Wells. *Id*.

Officer Echols kept "cussing," so "that's when [Mr. Wells] said" that "if [they were]n't in the jail," he'd "beat [Officer Echols's] ass." *Id*. at 19. Officer Echols responded that he would "beat [Mr. Wells's] ass" and got "all in [Mr. Wells's] face." *Id.* At some point, Officer Burton and Officer Bloodworth "got between [Officer Echols] and [Mr. Wells] and they . . . pinned" Mr. Wells and were "trying to hold [Officer Echols] back from getting to" Mr. Wells. *Id*.

According to the interoffice communication from Sergeant Harden to Police Chief Smith, Officer Burton "stated [that] she had to physically step in between Officer Echols and [Mr.] Wells to separate them" and that "Officer Wells stated[,] 'He would stick Officer Echols and watch him bleed out.'" Doc. 18-3 at 44. Officer Burton testified that she did "not remember specific words" from this incident. Doc. 18-7 at 4–5. Mr. Wells disputes saying that he "would stick Officer Echols and watch him bleed out," *compare* Doc. 18-3 at 44, *and* Doc. 20 ¶¶ 27, 30, *with* Doc. 26 ¶¶ 27, 30 at 6, and he "admit[s] that [he] said" that he "would beat" Officer Echols's "ass," Doc. 18-1 at 20.

The day of the incident, Mr. Wells "was taken out of service (i.e., removed from duty)." Doc. 20 ¶ 28; Doc. 26 at 4; *see also* Doc. 18-1 at 135. Mr. Wells testified that "[d]uring the period of time when [he] w[as] taken out of service," he was "relocated to . . . the property room" in Birmingham Police Department's

"headquarters building." Doc. 18-1 at 20. He "continued to receive [his] pay at the same rate of pay" but was not eligible for overtime pay during this period. *Id*.

Captain David Rockett, commander of the Internal Affairs Division at the Birmingham Police Department, testified that when an employee is taken out of service, the employee does not "work overtime and . . . typically work[s] the same hours that Internal Affairs works, which would be Monday through Friday 8:00 to 5:00." Doc. 18-2 at 3, 12. Captain Rockett further testified that an employee who is taken out of service "continue[s] to receive pay" and "continue[s] to receive health insurance, vacation and sick time, and all the other benefits that the[ employee] normally get[s] as a city employee." *Id*. at 28.

On May 5, 2020, Mr. Wells was "order[ed] to have no contact with [Officer] Echols." Doc. 20 ¶ 32; Doc. 26 ¶ 32 at 6 (admitting that "there was a stay away order"); *see also* Doc. 18-1 at 137 (the "stay away order"). On May 12, 2020, Mr. Wells "was referred over to BHS" because of his involvement in the Echols incident. *See* Doc. 18-1 at 21; *see also id*. at 136 (the supervisory referral form).

"On February 22, 2021, the City advised [Mr. Wells] in writing that disciplinary action against him was being contemplated for the Echols altercation; the pre-determination hearing was held on March 3, 2021." Doc. 20 ¶ 37; Doc. 26 at 4; *see also* Doc. 18-1 at 132. "Police Chief Patrick Smith made the decision to suspend [Mr. Wells] for seven (7) working days." Doc. 20 ¶ 38; Doc. 26 at 4; *see*

*also* Doc. 18-1 at 130. Officer "Echols received three (3) working days suspension for the incident." Doc. 20 ¶ 40; Doc. 26 at 4; *see also* Doc. 18-2 at 24.

The parties dispute Sergeant Blackwell's role in disciplining Mr. Wells. Mr. Wells testified that he believed Sergeant Blackwell was involved because he got written up and was suspended for "a total of around [thirty] days . . . within [the] year . . . that Sergeant Blackwell arrived at the jail." Doc. 18-1 at 24. Mr. Wells further testified that "[b]efore Sergeant Blackwell arrived at the jail, [Mr. Wells] only had . . . three disciplinar[y incidents] where [he] was given . . . days off," and once Sergeant Blackwell arrived, Mr. Wells had five disciplinary incidents. *Id*. at 25.

As a specific example of Sergeant Blackwell's perceived involvement, Mr. Wells referenced the circumstances surrounding one of his BHS referrals. Mr. Wells testified that he talked about one of his disciplinary incidents with Lieutenant Greenberg and Lieutenant Greenberg "said everything was fine." *Id*. at 25. But the "next time [City employees] called [Mr. Wells] back, Sergeant Blackwell [was] sitting next to" Lieutenant Greenberg and Mr. Wells was informed that he was being referred to BHS "to see a counselor." *Id*. Mr. Wells later testified that he "do[es]n't think Sergeant Blackwell had [him] taken out of service because Sergeant Blackwell doesn't work for" the Internal Affairs Division of the Birmingham Police Department. *Id*. at 26.

Sergeant Blackwell testified that he is not "responsible for deciding who gets disciplined." Doc. 18-4 at 15. Sergeant Blackwell further testified that he "[n]ever asked the chief of police to discipline [Mr.] Wells," and that he was neither "involved in taking any disciplinary actions against [Mr.] Wells" nor "refer[red] Mr. Wells to" BHS. Doc. 18-4 at 5, 16. Mr. Wells admits that Sergeant Blackwell "stated this" and asserts that his testimony is "flat-out false." Doc. 26 ¶ 45 at 7.

Procedure Number 110-2 of the Birmingham Policy Department Rules and Regulations "states in relevant part: 'Disciplinary hearings will be scheduled no later than 60 days following the initial complaint unless there are extenuating circumstances such as court proceedings.'" Doc. 20 ¶ 46; Doc. 26 at 4; *see also* Doc. 18-6 at 35. "Captain . . . Rockett . . . testified that [the Internal Affairs Division] does not stick closely to the 60 day rule because of 'workload and scheduling,' and that, 'In an ideal world [the Internal Affairs Division] might be able to investigate all cases in order with no interruptions, but in the real world that's not possible.'" Doc. 20 ¶ 47; Doc. 26 at 4; *see also* Doc 18-2 at 6.

The relevant dates for each disciplinary incident are:

| Disciplinary Incident | Incident Date | Disciplinary Hearing Date |
|---|---|---|
| The Food Cart Incident | February 24, 2019 | November 4, 2019 |
| The Lockdown Incident | June 26, 2019 | August 4, 2020 |
| The Tonya Wright Incident | February 25, 2020 | September 14, 2020 |
| The Sleeping Incident | April 1, 2020 | January 13, 2021 |
| The Echols Incident | May 3, 2020 | May 3, 2021 |

Doc. 18-1 at 114–16.

Mr. Wells brings this action under 42 U.S.C. § 1983 ("Section 1983"), alleging violations of his right to equal protection and procedural due process. *See generally* Doc. 1. The Defendants moved for summary judgment. Doc. 19. The motion is fully briefed. Doc. 20; Doc. 26; Doc. 27.

## II.    STANDARD OF REVIEW

A party moving for summary judgment must establish "that there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it could "affect the outcome" of the case. *Furcron v. Mail Ctrs. Plus*, *LLC*, 843 F.3d 1295, 1303 (11th Cir. 2016) (cleaned up). A material fact is in "genuine" dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (cleaned up).

"The movant's initial burden consists of a responsibility to inform the court of the basis for its motion and to identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (cleaned up). When the nonmovant bears the burden of proof at trial, then the movant's initial burden is not to "negate[]" an element of the nonmovant's case. *Id.* (emphasis omitted). Instead, the movant can satisfy its initial burden by "showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) (cleaned up).

To do this, the movant "must point to specific portions of the record in order to demonstrate that the nonmoving party cannot meet its burden of proof at trial." *United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Cntys.*, 941 F.2d 1428, 1438 n.19 (11th Cir. 1991) (en banc) ("*Four Parcels*"). For example, the movant may point to the nonmovant's response to an interrogatory and note that the response fails to identify a basis of proof for an essential element of the nonmovant's case. *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 607 (11th Cir. 1991). "[I]t is never enough simply to state that the non-moving party cannot meet its burden at trial." *Id.* at 608.

If the moving party has carried its initial burden, Rule 56 requires the nonmoving party to "go beyond the pleadings" and establish that there is a material fact in genuine dispute. *Celotex*, 477 U.S. at 324; *see also* Fed. R. Civ. P. 56(c)(1)(A). In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (cleaned up).

## III.   ANALYSIS

### A. Count One

Count One asserts a gender discrimination claim against the Defendants under Section 1983. *See* Doc. 1 ¶¶ 63–114. The City asserts that municipal liability is improper because Mr. Wells "has not shown a violation of the Fourteenth Amendment" because he has "not established that intentional gender discrimination occurred." Doc. 20 at 13 (emphasis omitted). And Sergeant Blackwell asserts a qualified immunity defense to the extent that Mr. Wells asserts his claims against Sergeant Blackwell in his individual capacity. *See id.* at 23–25.

Each of the Defendants' arguments require that the court first consider whether there is a genuine dispute of material fact that intentional gender

discrimination occurred. *See Rooney v. Watson*, 101 F.3d 1378, 1381 (11th Cir. 1996) (affirming summary judgment to a county-defendant because "an inquiry into a governmental entity's custom or policy is relevant only when a constitutional deprivation has occurred"); *see also Harris-Billups v. Anderson*, 61 F.4th 1298, 1302 (11th Cir. 2023) (affirming summary judgment on qualified immunity grounds to an officer because the officer did not "violate[] one or more [of the plaintiff's] constitutional rights") (cleaned up). Accordingly, the court's analysis considers that issue first.

### i. Gender Discrimination

Employment discrimination claims are "typically categorized as either mixed-motive or single-motive claims." *Quigg v. Thomas County Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016). A mixed-motive claim is based on the allegation that "illegal bias, such as bias based on sex or gender, 'was a motivating factor for' an adverse employment action, 'even though other factors also motivated' the action." *Id.* (quoting 42 U.S.C. § 2000e-2(m)). Single-motive claims, on the other hand, "require a showing that bias was the true reason for the adverse action." *Id.* Both single-motive and mixed-motive claims "can be established with either direct or circumstantial evidence." *Id.*

Although Mr. Wells asserts that he can present sufficient evidence under the *McDonnell Douglas* framework, the convincing mosaic of circumstantial evidence

framework, and the *Quigg* mixed-motives framework, *see* Doc. 26 at 30–31, he presents only legal arguments regarding the sufficiency of his evidence under the *McDonnell Douglas* framework, *see id*. at 31–35.

"To prevail on a particular theory of liability, a party must present that argument to the district court." *Fils v. City of Aventura*, 647 F.3d 1272, 1284 (11th Cir. 2011). "Our adversarial system requires it; district courts cannot concoct or resurrect arguments neither made nor advanced by the parties." *Id*. Accordingly, the court's analysis proceeds under the *McDonnell Douglas* framework and does not consider the sufficiency of Mr. Wells's evidence under the other legal frameworks.

"When proceeding under [the] *McDonnell Douglas* [framework], the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination by showing (1) that []he belongs to a protected class, (2) that []he was subjected to an adverse employment action, (3) that []he was qualified to perform the job in question, and (4) that h[is] employer treated 'similarly situated' employees outside h[is] class more favorably." *Lewis v. City of Union City*, 918 F.3d 1213, 1220–21 (11th Cir. 2019) (en banc) ("*Lewis I*"). "If the plaintiff succeeds in making out a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions." *Id*. at 1221. "Finally, should the defendant carry its burden, the plaintiff must then demonstrate that the defendant's proffered reason was merely a pretext for unlawful discrimination, an obligation that merges

with the plaintiff's ultimate burden of persuading the factfinder that []he has been the victim of intentional discrimination." *Id*. (cleaned up).

Mr. Wells was disciplined on five separate occasions and received two supervisory referrals. *See* Doc. 18-1 at 114–16, 124–25, 136. The Defendants present two separate arguments: *First*, the Defendants assert that Mr. Wells cannot establish the third element as to his supervisory referrals because "a supervisory referral, with no resulting impact on the employee or his employment, is [not] an adverse action." Doc. 27 at 11; *see also* Doc. 20 ¶ 18 (asserting that "[a] supervisory referral is not disciplinary"). *Second*, the Defendants assert that as to the remaining five disciplinary incidents, Mr. Wells "has not established that women engaged in substantially similar behavior and received more favorable treatment than men." Doc. 20 at 14, 16; *see also id*. at 15–16 (alleging factual dissimilarities between Mr. Wells and his comparators for each incident). The court examines each argument in turn.

*First*, "not all conduct by an employer negatively affecting an employee constitutes adverse employment action." *Davis v. Town of Lake Park*, 245 F.3d 1232, 1238 (11th Cir. 2001), *overruled on unrelated grounds as recognized by Bhuiyan v. PNC Bank, Nat'l Ass'n*, No. 19-14265, 2023 WL 2733510, at *4 (11th Cir. Mar. 31, 2023). "[A]n adverse employment action" is "[a] tangible employment action [that] constitutes [a] significant change in employment status such as hiring,

firing, failing to promote, reassignment with significantly different responsibilities or a decision causing a significant change in benefits." *Webb-Edwards v. Orange Cnty. Sheriff's Off.*, 525 F.3d 1013, 1031 (11th Cir. 2008) (cleaned up).

Mr. Wells testified that because of his supervisory referral, he attended counseling sessions once a week. Doc. 18-1 at 13–14. He further testified that he "work[ed] during th[at] . . . time" and that he "did [not] have to pay out of pocket to attend [his counseling] sessions." *Id.*; *see also* Doc. 18-3 at 6 (confirming that a city "employee get[s] paid for their time going to the counselor" because "they go on work time"). Accordingly, the supervisor referrals were not adverse actions, and the Defendants' motion for summary judgment is **GRANTED** as to the claims in Count I that are based on these supervisory referrals.

As to the Defendants' *second* argument, "[a] plaintiff needn't prove . . . that []he and h[is] comparators are identical save for their race or gender . . . ." *Lewis I*, 918 F.3d at 1227. "[W]hat constitutes a 'material' similarity or difference will differ from case to case, [and] ordinarily a similarly situated comparator and the plaintiff will: have engaged in the same basic conduct or misconduct, be subject to the same employment policies, have the same supervisor(s), and share an employment or disciplinary history." *Jenkins v. Nell*, 26 F.4th 1243, 1249 (11th Cir. 2022). "In short, . . . a valid comparison will turn not on formal labels, but rather on substantive likenesses." *Lewis I*, 918 F.3d at 1228.

Mr. Wells identified Officer Bettis and Officer Robinson as potential comparators, *see* Doc. 26 at 34; Doc. 27 at 10, but these individuals share Mr. Wells's protected class and therefore are not valid comparators, *see Lewis I*, 918 F.3d at 1221; Doc. 18-1 at 17 (testifying as to the gender of these alleged comparators). Mr. Wells also identified Tameeka Marshall, Tonya Wright, Markeeta Green, and Camellia Moore as potential comparators who engaged in the same basic conduct (or misconduct) as himself. *See generally* Doc. 26 at 32–36. The Defendants respond that "the[se] potential comparators did not engage in similar behavior." Doc. 27 at 10.

Mr. Wells identifies Tameeka Marshall as a comparator for the food cart incident because she "was not disciplined or counseled in any way for her conduct" and "had previously been suspended [three] days for kicking a person in the chest." Doc. 26 at 32 (emphasis omitted). The Defendants explain that Ms. Marshall was not disciplined for her role in the food cart incident because she "did not kick over the food cart." Doc. 27 at 10. Accordingly, Ms. Marshall is not a proper comparator "because there is no evidence that [she] engaged in similar misconduct as" Mr. Wells. *See Jenkins*, 26 F.4th at 1250.

Mr. Wells identifies Tonya Wright and Markeeta Green as his comparators for the lockdown incident. Doc. 26 at 32–33. The Defendants respond that these comparators are not similarly situated because they "simply used profanity" but Mr.

Wells "disobeyed a direct order and attempted to physically leave the premises." Doc. 27 at 10; *accord* Doc. 20 at 15. The Defendants further assert that "there is no indication that a female employee disobeyed a direct order and attempted to leave the facility during a lockdown." Doc. 20 at 15.

Whether Captain Wilson *should* have instructed Mr. Wells not to leave the jail is a factual dispute that the court does not (and need not) decide. *Compare* Doc. 20 ¶ 10, *with* Doc. 26 ¶ 10 at 5. Although Mr. Wells "totally disagree[s]" that he was insubordinate, he testified that Captain Wilson instructed him not to "open th[e] door" and that he "attempt[ed] to leave" anyway. Doc. 18-1 at 10–12 Accordingly, Ms. Wright and Ms. Green are not proper comparators "because there is no evidence that they engaged in similar misconduct as" Mr. Wells. *See Jenkins*, 26 F.4th at 1250.

Mr. Wells identifies Tonya Wright as his comparator for the Tonya Wright incident. Doc. 26 at 33. The Defendants respond that Mr. Wells and Ms. Wright "received the same discipline of [three] days suspension" for this incident. Doc. 27 at 10; *accord* Doc. 20 at 15. Mr. Wells does not dispute that he and Ms. Wright had a "verbal altercation" and emphasizes the factual differences between their conduct during this altercation. Doc. 20 ¶ 21; *see generally* Doc. 26; *see also id*. at 33.

But when a plaintiff and a potential comparator receive the same discipline for the part each one plays in an incident, district courts in this Circuit "do not

examine the diminutive differences that lie within the employer's reasonable discretion—such as whether the comparator's conduct was less [or more] egregious than the plaintiff's conduct." *Whiteside v. PCC Airfoils LLC*, No. 5:21-cv-62, 2023 WL 2787977, at *5 (S.D. Ga. Apr. 5, 2023) (cleaned up) (less egregious); *Mango v. Mitchell Cnty.*, No. 1:14-cv-00049 (LJA), 2016 WL 4697345, at *4 (M.D. Ga. Sept. 7, 2016) (more egregious); *see also Whitehurst v. Liquid Env't Sols., Inc.*, 45 F. Supp. 3d 1328, 1346 (M.D. Fla. 2014) (granting summary judgment to an employer when the employer treated the plaintiff "exactly the same as his" identified comparators for an incident involving "fighting and inappropriate behavior in the workplace"). Accordingly, Mr. Wells has not identified a proper comparator for the Tonya Wright incident.

Mr. Wells identifies Camelia Moore a comparator outside his own protected class for the sleeping incident. Doc. 26 at 34. The Defendants assert that Mr. Wells's "own testimony indicates there was no gender-based motive for this discipline because . . . men [also] received no discipline for supposedly falling asleep while on duty." Doc. 20 at 16 (citing Doc. 18-1 at 17); *see also* Doc. 27 at 10. Mr. Wells further testified that he has "no[] personal knowledge that" a supervisor "walked in on" Ms. Moore sleeping but he "believe[s]" or "know[s]" "that it has happened" because she "fall[s] asleep often." Doc. 18-1 at 17–18. Mr. Wells further testified that he is not aware of Ms. Moore's overall disciplinary history and was not present

at her disciplinary hearings. *Id*. at 18. Mr. Wells testified similarly about other male officers' propensity to sleep on the job and lack of discipline for it. *See id*. at 17–18

Ms. Moore is not a valid comparator for this incident for two reasons. *First*, Mr. Wells has offered no evidence that any supervisor was aware of Ms. Moore's conduct. District courts in this Circuit hold that "[d]isparate discipline cannot be shown without first showing that the employer was aware of the comparator's misconduct." *Vickers v. Fed. Express Corp.*, 132 F. Supp. 2d 1371, 1380 (S.D. Fla. 2000). *Second*, Mr. Wells's "belief that [Ms. Moore] was not disciplined is based on speculation and conjecture and, thus, is not reasonable." *See Hamilton v. Coffee Health Grp.*, 949 F. Supp. 2d 1119, 1158 (N.D. Ala. 2013) (cleaned up) (quoting *Blackston v. Shook & Fletcher Insulation Co.*, 764 F.2d 1480, 1482 (11th Cir. 1985)). Accordingly, Mr. Wells has not identified a proper comparator for the sleeping incident.

Mr. Wells identifies Tonya Wright as his comparator for the Echols incident because "[s]he had previously choked an inmate and only received a letter of censure." Doc. 26 at 34. The Defendants respond that "[t]he Echols incident is irrelevant for purposes of a comparator for disparate treatment because [Officer] Echols is male, . . . and he received [three] days for his part in the altercation with [Mr. Wells], compared to [Mr. Wells's] seven day[]" suspension. Doc. 27 at 10.

The Defendants' argument misses Mr. Wells's point. Mr. Wells did not identify Officer Echols as a comparator but asserted instead that Ms. Wright, who allegedly engaged in actual acts of violence rather than threats,[1] was not disciplined as severely as he was. *See* Doc. 26 at 34. Accordingly, Mr. Wells has identified a proper comparator for the Echols incident.

Because Defendants' motion fails with regard to Mr. Wells's *prima facie* case based on the Echols incident, the Defendants must "articulate a legitimate, nondiscriminatory reason for [their] actions" with respect to that incident. *See Lewis I*, 918 F.3d at 1221. The Defendants have not explained the apparent discrepancy between Ms. Wright's discipline and Mr. Wells's discipline. Accordingly, the Defendants have not carried their burden in establishing that at trial, Mr. Wells could not establish a *prima facie* case of discrimination.

### ii.  The City

"A municipality may not be held liable for the torts of its employees on a *respondeat superior* theory." *Lewis v. City of Union City*, 934 F.3d 1169, 1190 (11th Cir. 2019) ("*Lewis II*"). Instead, "[a] plaintiff can establish municipal liability . . . in three ways: (1) identifying an official policy; (2) identifying an unofficial custom or widespread practice that is so permanent and well settled as to constitute

---

[1] Mr. Wells disputes that he threatened Officer Echols. *See* Doc. 26 ¶¶ 27, 29, 30, 32–33 at 6. The court assumes *arguendo* that such a threat was made for the purpose of addressing the deficiency in the Defendants' argument. This disputed fact is not otherwise taken as true or construed against Mr. Wells in the court's analysis.

a custom and usage with the force of law; or (3) identifying a municipal official with final policymaking authority whose decision violated the plaintiff's constitutional rights." *Chabad Chayil, Inc. v. Sch. Bd. of Miami-Dade Cnty.*, 48 F.4th 1222, 1229 (11th Cir. 2022).

Mr. Wells appears to be proceeding under the second way. *See* Doc. 26 at 37. Specifically, Mr. Wells asserts that "females are systematically given more benefit of the doubt and leniency when being punished" and that "[t]his consistent favoritism is so widespread [that] it is a custom." *Id*. Mr. Wells does not cite any evidence in the record for this position. *See id*. The City asserts that the record does not establish such a custom or widespread practice. *See* Doc. 20 at 14.

As described *supra* at 18–23, Mr. Wells carried his initial burden of establishing a *prima facie* case of discrimination for only one of his disciplinary incidents. But "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability" against a municipality. *City of Okla. City v. Tuttle*, 471 U.S. 808, 823–24 (1985) (plurality opinion). "A pattern of similar constitutional violations is . . . ordinarily necessary . . . ." *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (cleaned up).

"A single incident would not be so pervasive as to be a custom because a custom must be such a longstanding and widespread practice that it is deemed authorized by the policymaking officials because they must have known about it but

failed to stop it." *Craig v. Floyd Cnty.*, 643 F.3d 1306, 1310 (11th Cir. 2011) (cleaned up). "This requirement of proof prevents the imposition of liability based upon an isolated incident and ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Id.* (cleaned up). Accordingly, the City is entitled to summary judgment as to Count I, and the motion is **GRANTED** as to that claim.

### iii.  Sergeant Blackwell

### 1.  Official Capacity

Sergeant Blackwell asserts that "[i]t is unclear whether [Mr. Wells] intended to bring claims against [Sergeant] Blackwell in his official capacity or individual capacity." Doc. 20 at 23. He further asserts "[i]n this case, an official capacity claim would be duplicitous because the City of Birmingham is already a defendant in this case." *Id*. Mr. Wells does not respond specifically to this assertion. *See generally* Doc. 26 at 40–43.

Sergeant Blackwell is correct on this point. *See Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991). "Because suits against a municipal officer sued in his official capacity and direct suits against municipalities are functionally equivalent, there no longer exists a need to bring official-capacity actions against local government officials, because local government units can be sued directly . . .

." *Id*. Accordingly, the motion is **GRANTED** as to any claims Mr. Wells may have alleged against Sergeant Blackwell in his official capacity.

## 2.  Individual Capacity

Sergeant Blackwell asserts a qualified immunity defense. *See* Doc. 20 at 23–25. "Qualified immunity protects government officials performing discretionary functions from civil trials . . . and from liability if their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." *Ireland v. Prummell*, 53 F.4th 1274, 1297 (11th Cir. 2022) (cleaned up). "To receive qualified immunity, the official must first prove that he was acting within the scope of his discretionary authority when the allegedly unlawful conduct took place." *Hamlet v. Martin Corr. Inst.*, No. 21-11937, 2022 WL 16827438, at *3 (11th Cir. Nov. 9, 2022). Sergeant Blackwell asserts that he "was acting within the scope of his duties" during the events relevant to this action, Doc. 20 at 24, and Mr. Wells does not contest this assertion, *see generally* Doc. 26 at 40–44.

"Once an official establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to demonstrate (1) that the facts show that the official violated the plaintiff's constitutional rights and (2) that the law clearly established those rights at the time of the alleged misconduct." *Hamlet*, 2022 WL 16827438, at *3 (cleaned up). Federal courts "may undertake these two inquiries in either order." *Barcelona v. Burkes*, No. 21-14285, 2022 WL 15137410, at *2 (11th

Cir. Oct. 27, 2022) (cleaned up); *accord Christmas v. Harris Cnty.*, 51 F.4th 1348, 1354 (11th Cir. 2022) ("Courts are permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first.") (cleaned up).

Mr. Wells asserts that Sergeant "Blackwell personally participated in the discriminatory discipline as he wrote up [Mr.] Wells differently than [Ms.] Wright and [Ms.] Green" for the lockdown incident, he "was present and put pressure on [Mr. Wells's supervisor] to document the sleeping incident," and he participated in referring Mr. Wells to BHS. *See* Doc. 26 at 43. But as described *supra* at 18–23, Mr. Wells did not establish a *prima facie* case of discrimination as to these events.

Accordingly, Sergeant Blackwell is entitled to qualified immunity, and the motion is **GRANTED** on the ground that Mr. Wells has not established the necessary constitutional violation by him.

### B. Count Two

The Defendants assert that the complaint does not "specify if the claim is based on substantive o[r] procedural due process" and that the pleaded allegations "imply the intent to bring a procedural due process claim." Doc. 20 at 17. Mr. Wells did not specifically respond to this assertion and relies on caselaw describing the elements of a procedural due process claim. *See*, *e.g.*, Doc. 26 at 37–40. Mr. Wells's pleaded allegations assert a procedural due process claim. *Compare McKinney v.*

*Pate*, 20 F.3d 1550, 1559 (11th Cir. 1994) (en banc) ("Whe[n] an individual complains that a state lacks constitutionally adequate procedures for" adverse employment actions, "he has raised only procedural due process concerns."), *with* Doc. 1 ¶¶ 113–18.

"A procedural due process claim consists of two elements: (i) deprivation by state action of a protected interest in life, liberty, or property, and (ii) inadequate state process." *Reed v. Goertz*, 143 S. Ct. 955, 961 (2023); *accord Ross v. Clayton Cnty.*, 173 F.3d 1305, 1307 (11th Cir. 1999) (applying these elements in the employment context). Mr. Wells asserts that he "was deprived of his right[]" to procedural due process (1) "when he was required to go to [BHS], was taken out of service, was banned from the property, and refused additional overtime hours" and (2) "[w]hen he was denied a hearing within [sixty] days of the initial complaint [for each incident] without justification." Doc. 1 ¶ 113. The court examines each asserted event in turn.

### i.  The BHS Referral And Associated Events

The Defendants concede that Mr. Wells "had[2] a property interest in his continued employment" and asserts that he "cannot show that he was deprived of that interest." Doc. 20 at 18. The Defendants assert that although Mr. Wells had an "interest of continuous employment in his classified position . . . , it does not follow

---

[2] Mr. Wells is no longer an employee with the City for reasons unrelated to this lawsuit. *See* Doc. 20 at 3 n.1; *accord* Doc. 18-1 at 15 (confirming Mr. Wells's effective date of termination).

that [Mr. Wells] ha[d] a property right in overtime or not being given a supervisory referral." *Id.* at 19. The Defendants further assert that Mr. Wells did not have an "established property interest" in "receiving overtime" because "the Supreme Court has held that employment rights are not absolute." *Id.* at 20 (emphasis omitted).

Mr. Wells does not respond specifically to the Defendants' arguments regarding the referral to BHS and associated events other than:

> [The Defendants arguments] do[]n't explain how [Mr.] Wells was referred to [BHS] without notice or a hearing, and completed the referral, long before he ever had a hearing. [Mr.] Wells was still required to work out of service until the hearing even though he had already been released by [BHS]. [Mr.] Wells worked out of service for a year. This caused him to lose substantial overtime. Clearly, [Mr.] Wells established violations of due process.

Doc. 26 at 40. On reply, the Defendants reiterate that "a supervisory referral that does not itself carry with it any change in job duties, title, money, or any discipline cannot be considered a [violation of a] due process right." Doc. 27 at 13.

"To determine what process is constitutionally due, [the Supreme Court] ha[s] generally balanced three distinct factors:" (1) "the private interest that will be affected by the official action;" (2) "the Government's interest;" and (3) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards." *Gilbert v. Homar*, 520 U.S. 924, 931–32 (1997) (cleaned up).

Regarding the first factor, the Defendants assert that "[t]he private interest affected in this case is unclear" because Mr. Wells seeks relief because his supervisory referral occurred without a hearing and he lost the opportunity to obtain overtime payments while he was out of service. Doc. 20 at 19–20. Mr. Wells did not respond specifically to the Defendants' alleged uncertainty regarding the private interest for which he seeks relief and emphasized legal principles regarding the property interest an employee has in his employment, generally. *See generally* Doc. 26 at 38–39.

The Supreme Court "ha[s] not had occasion to decide whether the protections of the Due Process Clause extend to discipline of . . . public employees short of termination." *Gilbert*, 520 U.S. at 929. The Supreme Court "ha[s] recognized the severity of depriving someone of the means of his livelihood" and "ha[s] also emphasized that in determining what process is due, account must be taken of the *length* and *finality* of the deprivation." *Id.* at 932 (cleaned up and emphasis in original).

For example, in *Gilbert*, a public employee alleged that his employer's "failure to provide him with notice and an opportunity to be heard before suspending him without pay violated due process." 520 U.S. at 928. The *Gilbert* court held that a temporary suspension without pay minimally affected the private interest in the employee's "means of . . . livelihood" because temporarily "lost income is relatively

insubstantial (compared with termination), and fringe benefits such as health and life insurance [we]re often not affected at all." *Id*. at 932.

Mr. Wells testified that he "did [not] have to pay out of pocket to attend [his BHS counseling] sessions" and that he "continued to receive [his] pay at the same rate of pay" while he was out of service. Doc. 18-1 at 14, 20. Mr. Wells further testified that it is not "automatic that everyone gets overtime" and clarified that being out of service rendered him ineligible for overtime if such overtime was required. *Id*. at 20.

Under *Gilbert*, Mr. Well's private interest appears only minimally effected. *First*, Mr. Wells conceded that overtime is not "automatic" and that he continued to receive his standard rate of pay while out of service. *Id*. at 20. But in *Gilbert*, the employee was suspended without pay. 520 U.S. at 928, 932. *Second* and like the employee in *Gilbert*, Mr. Wells's fringe benefits were not affected while he was out of service. Doc. 20 ¶ 20; Doc. 26 at 4; *see also* Doc. 18-1 at 14; Doc. 18-2 at 28; Doc. 18-3 at 42.

Regarding the second factor, the Defendants assert that the government has an interest in "address[ing] the immediate concern that an employee potentially threatened to stab another employee" and "to ensure that the workplace would be safe for everyone" while the Internal Affairs Division conducted an internal investigation. Doc. 20 at 19. The Defendants further assert that "[i]t would be more

than a mere imposition to hold a full evidentiary hearing . . . before the investigation is conducted" because of "the governmental interest of ensuring one employee does not stab the other." *Id.* at 19–20 (emphasis omitted). Mr. Wells did not respond specifically to this assertion. *See* Doc. 26 at 40.

Whether Mr. Wells threatened to stab Officer Echols during the Echols incident is in dispute. *Compare* Doc. 20 ¶¶ 32–33, *with* Doc. 26 ¶¶ 32–33 at 6, *and* Doc. 26 at 21–24. The Defendants provided the court a copy of Mr. Wells's disciplinary history and his supervisory referral documents, and these documents state that Officer Burton overheard Mr. Wells threat to "stab" Officer Echols and "watch him bleed out." Doc. 18-1 at 115 (cleaned up); Doc. 18-3 at 44, 46. Captain Rockett testified "that at the time [Mr. Wells] was taken out of service," the Internal Affairs Division "understood that he said" "[s]omething to do with sticking or stabbing Officer Echols and watching him bleed out." Doc. 18-2 at 13.

At one point, Mr. Wells testified that he "didn't say [he] was going to do [any]thing" to Officer Echols and denied threatening Officer Echols. Doc. 18-1 at 19. Mr. Wells later testified that he told Officer Echols that if Officer Echols and Mr. Wells "were not in . . . uniform," then Mr. Wells would have "[b]eat [Officer Echols's] ass." Doc. 18-1 at 20. During her deposition, Officer Burton testified that she could no longer "remember [the] specific words" exchanged during the Echols incident. Doc. 18-7 at 5.

"Th[e Supreme] Court has recognized, on many occasions, that where a [government employer] must act quickly, or where it would be impractical to provide predeprivation process, postdeprivation process satisfies the requirements of the Due Process Clause." *Gilbert*, 520 U.S. at 930 (collecting cases). And the Supreme Court has "specifically . . . rejected the proposition that due process *always* requires [a government employer] to provide a hearing prior to the initial deprivation of property." *Id.* (cleaned up).

The government has an "interest in the expeditious removal of unsatisfactory employees," *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 543 (1985), and the Eleventh Circuit has "acknowledge[d] that where the employer perceives a significant hazard in keeping the employee on the job, the employer may" alter the conditions of employment "*with* pay even before granting an opportunity to be heard or notice," *Everett v. Napper*, 833 F.2d 1507, 1512 (11th Cir. 1987) (cleaned up and emphasis in original). Mr. Wells testified that he continued to receive his standard rate of pay while out of service, Doc. 18-1 at 20, and the Defendants identified a hazard that could have warranted expeditious removal of Mr. Wells from his work at the jail. *See* Doc. 20 at 19–20.

Regarding the third factor, the Defendants assert that "[t]he risk of error in this case is low and the value of additional safeguards is negligible" because

"employment rights are not absolute" and "may be abridged." *Id*. at 20 (emphasis omitted). Mr. Wells did not respond specifically to this assertion. *See* Doc. 26 at 40.

The Supreme Court has observed that "in the case of a" temporary change to the conditions of employment, a delay between the change and the final hearing "actually benefits the employee by allowing state officials to obtain more accurate information" and ensures that the employer is not "forced to act too quickly." *Gilbert*, 520 U.S. at 934–35. Just so here. The investigative summary prepared by the Internal Affairs Division ultimately recommended that the allegation that Mr. Wells threatened to stab Officer Echols "be classified as not sustained." Doc. 25-19 at 6 (cleaned up).

On summary judgment, the Defendants "must point to specific portions of the record in order to demonstrate that [Mr. Wells] cannot meet [this] burden of proof at trial." *Four Parcels*, 941 F.2d at 1438 n.19. And to avoid dismissal of his claims, Mr. Wells must respond by "go[ing] beyond the pleadings" and establishing that there is a material fact in genuine dispute. *Celotex*, 477 U.S. at 324.

The Defendants asserted that there is no genuine dispute of material fact that Mr. Wells was not deprived of due process when the Defendants referred him to BHS and temporarily removed him from service without a hearing. Mr. Wells did not respond specifically to the Defendants' argument on this issue and, instead, emphasized that Mr. Wells "worked out of service for a year" before he received a

hearing regarding the Echols incident. Doc. 26 at 40. But "[w]hether [Mr. Wells] was provided an adequately prompt . . . hearing" after the conditions of his employment changed "is a separate question." *See Gilbert*, 520 U.S. at 935. Accordingly, Mr. Wells did not establish that there is a genuine dispute of material fact that the BHS referral and removal from service occurred without due process, and summary judgment is **GRANTED** as to that aspect of his claim.

### ii. More Than Sixty Days Between Each Incident And Its Respective Hearing

Procedure Number 110-2 of the Birmingham Policy Department Rules and Regulations "states in relevant part: 'Disciplinary hearings will be scheduled no later than 60 days following the initial complaint unless there are extenuating circumstances such as court proceedings.'" Doc. 20 ¶ 46; Doc. 26 at 4; *see also* Doc. 18-6 at 35. The parties do not dispute that none of the disciplinary hearings relevant to this case occurred within sixty days of the initial complaint. *See generally* Doc. 18-1 at 112–16 (Mr. Wells's disciplinary history); *see also* Doc. 20 ¶¶ 3, 5, 8, 13, 21–22, 26, 37, 41–42; Doc. 26 at 4–6 (disputing only the Defendants' characterization of some of these incidents but not the dates of occurrence).

The Defendants assert three reasons why they are entitled to summary judgment to the extent Mr. Wells seeks relief based on this internal policy. *First*, the Defendants assert that the delay was due to a staffing shortage which "falls under the 'extenuating circumstances' exception outlined in the procedure." Doc. 20 at 21.

*Second*, the Defendants assert that "an internal policy establishing deadlines for completing internal complaints does not inherently create a due process owed." *Id.* *Third*, the Defendants assert that Mr. Wells "had an opportunity to appeal, which he chose not to do" and asserts that there can be no due process violation when Mr. Wells has not availed himself of all available relief. *Id.* at 21–22.

Mr. Wells responds as follows: *First*, Mr. Wells asserts that the Defendants cannot rely on the extenuating circumstances exception because "there was testimony that the City was always short staffed." Doc. 26 at 40. *Second*, Mr. Wells asserts he "had a[n] . . . interest in having the hearing[s] within 60 days [because] that was the rule." *Id.* at 39 Mr. Wells does not respond specifically to the Defendants' *third* reason why they are entitled to summary judgment. *See generally id.* at 37–40.

The Defendants are entitled to summary judgment under the *second* reason. As an initial matter, Mr. Wells appears to misunderstand the nature of the property interest at issue in his claims. Mr. Wells asserts that he "had a property interest in having the hearing within 60 days [because] that was the rule." Doc. 26 at 39; *but see* Doc. 27 at 12 (alleging that "fundamental rights are rooted in the Constitution, not in state law or in county policies and procedures manuals"). A procedural due process claim asserts that an individual was denied the protections afforded to "a substantive interest to which the individual has a legitimate claim of

entitlement." *Louis Del Favero Orchids, Inc. v. Rivkees*, No. 19-14930, 2022 WL 2237663, at *5 (11th Cir. June 22, 2022). But the process due is not, itself, a protected property interest. *See id.* ([P]rocedural due process doesn't create a standalone right to process itself.").

The Defendants concede that Mr. Wells had a protected interest in his employment. Doc. 20 at 18; *accord Gilbert*, 520 U.S. at 928 ("[A government] employee has a constitutionally protected 'property' interest" in "employment."). And binding precedent suggests that a timely hearing may be the process an employee is due before that employee is disciplined. *See generally Gilbert*, 520 U.S. at 929 (assuming "without deciding" that disciplining an employee "infringe[s] on] a protected property interest") (cleaned up). Accordingly, Mr. Wells does not have a property interest in the hearing because the hearing is the procedural protection given to the interest Mr. Wells had in his employment. *See Louis Del Favero Orchids, Inc.*, 2022 WL 2237663, at *5 ("There is a difference between a right to a license and the right to have an application reviewed.").

"[N]oncompliance with personnel policies is not a *per se* denial of procedural due process." *Black v. City of Auburn*, 857 F. Supp. 1540, 1547 (M.D. Ala. 1994), *aff'd*, 56 F.3d 1391 (11th Cir. 1995); *accord Harris v. Birmingham Bd. of Educ.*, 817 F.2d 1525, 1528 (11th Cir. 1987) ("[T]he violation of a state statute outlining procedure does not necessarily equate to a due process violation under the

federal constitution. If otherwise, federal courts would have the task of insuring strict compliance with state procedural regulations and statutes."); *Cochran v. Collins*, 253 F. Supp. 2d 1295, 1304 n.1 (N.D. Ga. 2003) ("The plaintiff's procedural due process rights are determined by federal law. Thus, even if the defendants failed to comply with all of the handbook provisions, that failure is in itself insufficient to establish a violation of procedural due process.") (cleaned up).

"[P]rocedural due process does not require that a hearing be held within [the time] period [proscribed by an internal policy], but within a reasonable time." *Black*, 857 F. Supp. at 1547; *accord Hatcher v. Bd. of Pub. Educ. & Orphanage for Bibb Cnty.*, 809 F.2d 1546, 1554 (11th Cir. 1987) (holding that a hearing must be conducted in a "reasonable time"). But Mr. Wells did not assert in his complaint that his hearings were not conducted in a reasonable time. *See generally* Doc. 1. Instead, Mr. Wells sought relief only because his hearings were not conducted within sixty days of each incident's occurrence as proscribed by the Birmingham Police Department's internal policy. *See* Doc. 1 ¶¶ 60; 113(b)–18; *accord* Doc. 26 at 39–40 (reiterating this theory of liability on summary judgment).

Because the failure to conduct a hearing within sixty days "is in itself insufficient to establish a violation of procedural due process," *Cochran*, 253 F. Supp. 2d at 1304 n.1, summary judgment is **GRANTED** in favor of the Defendants and against Mr. Wells for his due process claim.

## IV.   CONCLUSION

For the foregoing reason, the motion for summary judgment, Doc. 19, is **GRANTED**. The court will enter a separate order consistent with this Memorandum Opinion.

**DONE** and **ORDERED** this 28th day of July, 2023.

_____
**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE